## UNITED STATES DISTRICT COURT
## NORTHERN  DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MARY DOHRMAN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-04-S-2550-NE |
| | ) | |
| CITY OF MADISON BOARD OF | ) | |
| EDUCATION; and DR. HENRY J. | ) | |
| CLARK, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This action, filed under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), is before the court on defendants' motion for summary judgment.[1]  The parties have each filed exemplary briefs in support of their respective positions.  Plaintiff has also filed a motion to strike certain portions of defendants' evidentiary submissions.[2]  For the reasons set forth below, defendants' motion for summary judgment is due to be granted.  Plaintiff's motion to strike is due to be denied in part, and denied as moot in all other respects.[3]

---

[1] Doc. no. 16 (Defendants' Motion for Summary Judgment).

[2] Doc. no. 21 (Plaintiff's Motion to Strike).

[3] Because plaintiff objects to fifteen separate paragraphs in Defendant's Statement of Undisputed Facts, only some of which are actually relevant to this opinion, the court confronts and disposes of the objections that are relevant in the course of relaying the facts.  Whenever a paragraph

# PART ONE

## *Summary Judgment Standards*

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is

---

to which an objection was lodged is cited, the objection is resolved in the footnote. To the extent the subject paragraphs are not mentioned in this opinion, any accompanying objection is due to be denied as moot.

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is material to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921).  Put another way, "[t]he

court is not obligated . . . to deny summary judgment for the moving party when the

evidence favoring the nonmoving party is merely colorable or is not significantly

probative." *Raney v. Vision Guard Service, Inc.*, 120 F.3d 1192, 1196 (11th Cir.

1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## PART TWO

### *Summary of Relevant Facts*

The facts of this case are relatively straightforward.[4]  Plaintiff, Mary Dohrman,

is a 54-year-old woman who holds a Bachelor's degree in Secondary Education, and

---

[4] This recitation of the facts is stated in the light most favorable plaintiff, the non-moving party, and is drawn primarily from the parties' statements of undisputed facts, supplemented where necessary by the depositions, exhibits, and affidavits on file.

a teaching certificate issued by the State of Alabama.[5]  On August 1, 2003, plaintiff (then 51 years of age) was hired by defendant City of Madison Board of Education as a pre-school teacher's aide at Horizon Elementary School.[6]   From the commencement of her employment, plaintiff was assigned to work in the classroom of Jennifer McCormack, a teacher in the Early Learning Program at Horizon Elementary.[7]

McCormack testified during deposition that she began to have concerns about plaintiff's work performance the first week of school.[8]  Specifically, McCormack stated that plaintiff was "reserved" in the classroom, and appeared reluctant to help children in carrying out their tasks.[9]  McCormack also testified that plaintiff was ineffective at controlling children in the hallways during bathroom breaks, and that, eventually, she instructed plaintiff to take children to different bathrooms in order to avoid disrupting other classes.[10]  Another of McCormack's initial complaints was that plaintiff allegedly would sit down at lunch without first assisting the other teachers

---

[5] Doc. no. 18 (Defendants' Brief in Support of Summary Judgment), Defendant's Statement of Undisputed Facts, ¶ 1.

[6] *Id*. at ¶¶ 2-3.

[7] *Id*. at ¶¶ 4-5.

[8] *Id*. at Ex. F (Deposition of Jennifer McCormack), p. 47, lines 14-15.  *See also id*. at Defendant's Statement of Undisputed Facts, ¶ 28.

[9] *Id*. at Ex. F, p. 47, line19.  *See also id*. at Defendant's Statement of Undisputed Facts, ¶ 29.

[10] *Id*. at Defendant's Statement of Undisputed Facts, ¶ 31.

in situating the children.[11]  For example, McCormack expected plaintiff to do things such as assisting children to open milk containers, but plaintiff allegedly did not show initiative in that regard.[12]

As the weeks passed, McCormack testified that she began to observe other aspects of plaintiff's job performance that, she felt, were below par.[13]  During recess, for example, it was customary for the teachers to take their classes outside to the playground for fifteen to thirty minutes and interact with the children.[14]  According to McCormack,  plaintiff simply sat on the rocks under the playground equipment and showed little interest in active involvement.[15]  She recalled one occasion when plaintiff allegedly told the children that they should refrain from using the monkey bars if they did not know how to do so, rather than demonstrating how to use the equipment.[16]

Although McCormack had few, if any, discussions with plaintiff concerning her performance, McCormack testified that she did eventually take the issue up with

---

[11] Doc. no. 18, Defendant's Statement of Undisputed Facts, ¶ 30.

[12] *Id*. at Ex. F., p. 47, lines 9-22.

[13] *Id*. at Defendant's Statement of Undisputed Facts, ¶ 32.

[14] *Id*.

[15] *See, e.g., id.* at Ex. F, p. 54, lines 16-19 (responding in the affirmative to the question, "So you are telling me that from 15 to 30 minutes every day she would just sit on these rocks and do nothing?"); *see also id*. at Defendant's Statement of Undisputed Facts, ¶ 32.

[16] *See generally id*. at Ex. F, pp. 55-56; *see also id*. at Defendant's Statement of Undisputed Facts, ¶ 33.

higher authorities.[17]  Linda McGuiness was (and is) Principal at Horizon Elementary, but McCormack stated that she was more comfortable talking with the Assistant Principal, Tammy Summerville.[18]  Therefore, at some point in early September 2003, McCormack met with Summerville and explained her concerns about plaintiff's job performance.[19]  At that time, no action was taken against plaintiff and she was not informed of the meeting.[20]

Several weeks later, however, another incident commanded the attention of several Horizon Elementary employees.  As with all teacher's aides, plaintiff had been assigned since her first day to ride with children on the school bus.[21] No one ever explicitly explained to plaintiff what she was expected to do while riding the bus, but McCormack, McGuiness, and Summerville all thought it was obvious that plaintiff was there to assist the children in exiting at the stops, and to make sure none were left on the bus when it was parked.[22]  On September 22, 2003, a four-year old student was accidentally left on the bus plaintiff was riding when the other children,

---

[17] Doc. no. 18, Defendant's Statement of Undisputed Facts, ¶ 37.

[18] *Id*. at ¶¶ 7, 9, 37.

[19] *Id*. at ¶ 37.

[20] *Id*. at ¶ 42.

[21] *Id*. at ¶ 5.

[22] *Id*. at ¶¶ 6, 8, 10, 11, 36.

the bus driver, and plaintiff departed.[23]    After the child was discovered and

McGuiness was told of the incident, McGuiness met with plaintiff and McCormack.[24]

The witnesses characterized the conversation in various ways, but it appears that, at

the least, some responsibility was attributed to plaintiff.[25]  Later that day, McGuiness

summoned McCormack to her office separately, at which time McCormack revealed

all of her concerns about plaintiff's job performance to McGuiness.[26]  (McGuiness

also gained knowledge of McCormack's concerns through Summerville, who felt

moved to disclose them on that same day).[27]  At the end of her conversation with

---

[23] Doc. no. 18, Defendant's Statement of Undisputed Facts, ¶ 20.  The child was not harmed in the incident and was rescued within minutes of being left.  *See* doc. no. 20 (Plaintiff's Brief in Opposition to Summary Judgment), Plaintiff's Statement of Undisputed Facts, ¶ 19.

[24] Doc. no. 18, at ¶ 23.

[25] *Id*. at ¶¶ 24-25, 63.

[26] *Id*. at ¶ 49.  Plaintiff has moved to strike this paragraph in Defendant's Statement of Undisputed Facts, claiming it contains hearsay.  *See* doc. no. 21, ¶ 1.  Plaintiff's motion is due to be denied on this point.  McCormack's testimony that she had voiced her concerns to McGuiness is not offered to establish the *truth* of those concerns, or to attest to the actual subjective existence of such concerns, but to indicate *knowledge* on the part of a person who was in a position to make decisions based information at her disposal.  *See, e.g.*, 12A Fed. Proc., L. Ed. § 33:391 (2006) ("When a person's knowledge or state of mind is at issue, evidence that he or she has heard or read a statement may be relevant, and it lies beyond the reach of a hearsay objection"); *see also Heritage Homes of Attleboro, Inc. v. Seekonk Water Dist.*, 648 F.2d 761, 763 (1st Cir. 1981) (holding that statements were not hearsay where they established "that those at the meeting made or heard racially hostile remarks prior to voting against the real estate development"), *cert. granted*, *vacated on other grounds*, 454 U.S. 807 (1981).

[27] Doc. no. 18, ¶ 44.  Plaintiff has also objected to this paragraph on hearsay grounds.  *See* doc. no. 21, ¶ 1.  This objection is due to be overruled in light of the authority cited in the previous footnote.  McGuiness can certainly testify that she learned of McCormack's concerns; that information forms part of the basis for the adverse employment action which McGuiness eventually took, and therefore McGuiness's sheer *awareness* of the concerns is the relevant fact to be proven.  *See Cameron v. Community Aid For Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003)

McCormack, McGuiness allegedly stated that "she would take care of it," referring presumably to the claimed deficiencies in plaintiff's performance.[28]

Although plaintiff personally disbelieves McGuiness's testimony (along with each and every other allegation that plaintiff's work performance was inadequate[29]), McGuiness testified that in the days and weeks following the "bus incident" she began to observe plaintiff's work more closely.[30]  McGuiness did not document her observations, but testified that she concurred with McCormack, and concluded that plaintiff's performance was less than desirable.[31]  McGuiness testified further that, based on all of the information available to her, she "decided before the [F]all [B]reak that I thought it might be best that we dismiss Mrs. Dohrman. . . .  I know I made the decision prior to [F]all [B]reak [which commenced October 6, 2003]."[32]  Specifically,

---

(holding that reports received by an executive director concerning an employee's performance were not hearsay, because the reports were used to show the executive director's state of mind, not to prove the truth of the matter asserted in the reports).

[28] Doc. no. 18, ¶ 50.  Again, plaintiff moves to strike this paragraph, *see* doc. no. 21, ¶ 1, and again, the objection must be overruled.  Federal Rule of Evidence 803(3) provides that the hearsay rule should not be construed to exclude "[a] statement of the declarant's then existing state of mind . . . (such as *intent*, *plan*, [or] *motive*. . . )."  Fed. R. Evid. 803(3).  McGuiness's alleged statement indicates her *intent* to take some sort of remedial action with respect to plaintiff on the basis of the concerns voiced by McCormack.  As the discussion below will make clear, this is relevant insofar as it provides a permissible, rather than discriminatory, basis for McGuiness's subsequent actions.

[29] See generally doc. no. 20, Ex. H (Affidavit of Mary Dohrman), and specifically *id*. at p. 2, unnumbered ¶ 6.

[30] Doc. no. 18, ¶ 52.

[31] *Id*. at ¶¶ 58-59.

[32] *Id*. at Ex. B (Deposition of Linda McGuiness), p. 125, lines 4-10.  *See also id*. at Defendant's Statement of Undisputed Facts, ¶¶ 60, 62, 64.

-8-

she reached this conclusion during the week beginning September 29, 2003.[33]  During that same week, McGuiness allegedly placed a telephone call to Dr. Dee Fowler, the Assistant Superintendent of the school system.[34]  According to McGuiness, "it is my practice whenever I have an employee that I'm concerned about and am considering dismissing, I call Dr. Dee Fowler. . . ."[35]  McGuiness attests that she in fact spoke with Dr. Fowler and informed him of her intent to terminate plaintiff's employment.[36]

Meanwhile, on September 27, 2003, plaintiff took a home pregnancy test and discovered that she was pregnant.[37]  When she came to work the following Monday, September 29, plaintiff revealed her pregnancy to the bus driver, Shelley Durham.[38]  Durham apparently was the first person at Horizon Elementary to hear of the

---

[33] *Id*. at Ex. B, p. 125, line 21 - p. 126, line 1.

[34] *Id*. at Defendant's Statement of Undisputed Facts, ¶ 66.  Plaintiff objects to the information contained within paragraph 66 and presumably the entire line of questioning regarding the alleged conversation with Dr. Fowler.  *See* doc. no. 21, ¶ 1.  To the extent that plaintiff is contending that McGuiness's testimony that she simply called a certain individual is *hearsay*, such an objection is not even worthy of a response.  The *act* of placing a telephone call is in no way a "statement" under Federal Rule of Evidence 801(a), as the act was not intended to be an "assertion."  *See* Fed. R. Evid. 801(a)(2).  As for McGuiness's testimony that she told Dr. Fowler that she was "considering dismissal" of plaintiff, this is nothing more than a statement of then existing intent or state of mind, offered by defendants' to prove conformity with that intent in the future.  *See* Fed. R. Evid. 803(3). It is therefore admissible nonhearsay.

[35] Doc. no. 18, Ex. B, p. 121, lines 3-6.

[36] *Id*. at p. 121, lines 7-10 ("I recall having made that call to Dr. Fowler and saying something to the effect, 'Dr. Fowler, I have an employee that I'm concerned about and that I am considering dismissal [*sic*]'").

[37] *Id*. at Defendant's Statement of Undisputed Facts, ¶ 82.

[38] *Id*. at ¶ 83.

pregnancy, and she testified that she mentioned the news to two persons only: her husband, and Tami Bradford, the "Lead Bus Leader."[39]  Two days later, on October 1, 2003, plaintiff informed McCormack that she was pregnant in the course of asking to use the telephone to schedule a doctor's appointment.[40]  McCormack in turn told Assistant Principal Tammy Summerville of the pregnancy, noting that "it could be a false positive."[41]  McCormack testified that she told no one else about plaintiff's pregnancy, and Summerville testified that she also kept the information to herself.[42]  Plaintiff did inform one additional person during the week of September 29, however: in planning for her doctor's appointment, plaintiff contacted Melissa Young, who coordinates absences and arranges for substitute teachers and aides.[43]  When plaintiff told Young that she would be absent on October 3 for a doctor's appointment, she also volunteered that the appointment was concerning her possible pregnancy.[44]  Young testified that, on the day plaintiff actually missed work, she (Young) was not even present at school, and in any event did not divulge her knowledge of plaintiff's

---

[39] *Id*. at ¶¶ 84, 98.

[40] *Id*. at ¶¶ 85-86.

[41] Doc. no. 18, Defendant's Statement of Undisputed Facts, ¶ 88.

[42] *Id*. at ¶¶ 89-90.

[43] *Id*. at ¶¶ 91-92.

[44] *Id*. at ¶¶ 91, 93.

pregnancy to anyone.[45]  According to all school employees who knew of plaintiff's pregnancy during the week of September 29, Principal Linda McGuiness was not informed of the pregnancy during that week.[46]  Plaintiff testified that she had no evidence to the contrary.[47]

The following week, beginning October 6, 2003, was Fall Break.[48]  School resumed on Monday, October 13.[49]  Much happened during that day.  First, plaintiff states through an affidavit, executed subsequent to her deposition, that she arrived at Horizon Elementary dressed in maternity clothes.[50]  For the first time in this affidavit, plaintiff alleges that at 7:15 that morning, while walking into the school, she saw McGuiness stop and look at her "from head to toe."[51]  McGuiness apparently was not asked whether she recalled this particular sighting, but McGuiness, McCormack, and

---

[45] *Id*. at ¶¶ 94-95.  *See also* doc. no. 20, Ex. G (Deposition of Melissa Young), p. 48, line 12 - p. 29, line 18.

[46] McGuiness herself also confirms her lack of knowledge at this point in time.  Doc. no. 18, Defendant's Statement of Undisputed Facts, ¶ 118.

[47] *Id*. at ¶ 108.

[48] *Id*. at ¶ 99.

[49] *Id*. at ¶ 108.

[50] Doc. no. 20, Ex. H (Affidavit of Mary Dohrman), p. 3, unnumbered ¶ 3.  Indeed, in her deposition plaintiff testified that she had begun wearing her maternity clothes "[t]hat last week." Doc. no. 18, Defendant's Statement of Undisputed Facts, ¶ 113.

[51] Doc. no. 20, Ex. H, p. 3, ¶ 13.  *See also id*. at Plaintiff's Statement of Disputed Facts, ¶¶ 1, 2.  The court notes with curiosity that plaintiff testified clearly on the issues of maternity wear and McGuiness's knowledge of her pregnancy at her deposition without ever mentioning this claimed sighting, which is detailed with such specificity in her affidavit.  *See Clay v. Equifax, Inc.*, 762 F.2d 952, 955 n.3 (11th Cir. 1985) (discussing so-called "sham" affidavits).

Summerville all testified that they never noticed plaintiff wearing maternity clothing at *any* time.[52]

At some point after entering the building, plaintiff logged onto the computer in the school's library and filled out a time card for October 3, the day she was absent for a doctor's appointment.[53]  After selecting "sick" as the reason for the absence, plaintiff allegedly typed in "doctor visit - - pregnancy test" under the "comment" field.[54]  Absences reported on time cards are compiled and noted on the Employee Absence Report, a list that is generated once monthly by Linda Walker, the secretary for Horizon Elementary.[55]  Walker routinely provides copies of these reports to several school officials before passing them on to the central office, but it is undisputed that no mention of the reason for plaintiff's absence actually appeared in the "comment" section of this report.[56]  At her deposition, Walker confirmed that any statements in the "comment" section are created by the employee who fills out the absence report, and stated further that a comment could only be deleted through the "main software" in Walker's office.[57]  According to Walker, she is the only person

---

[52] Doc. no. 18, Defendant's Statement of Undisputed Facts, ¶¶ 114-117.  Young and Durham evidently were not asked whether they observed plaintiff in maternity clothing.

[53] *Id.* at Ex. A (Deposition of Mary Dohrman), p. 132, line 17 - p. 133, line 1.

[54] *Id.*

[55] *Id.* at Ex. H (Deposition of Linda Walker), p. 28, line 17 - p. 29, line 10.

[56] *Id.* at Defendant's Statement of Undisputed Facts, ¶¶ 101-102, 104.

[57] *Id.* at ¶ 105.

in the office with the password to alter the entries, and she did not delete any entries.[58]

In any event, later on October 13, McGuiness formally submitted to the Superintendent of Madison City Schools, Dr. Henry Clark, a recommendation that plaintiff's employment be terminated.[59] McGuiness testified that the "bus incident" was "one thing contributing to the decision" to fire plaintiff, but that plaintiff's general job performance and McCormack's concerns also played a role.[60] Dr. Clark included the termination proposal on the October 14 agenda for the Board of Education, and without further investigation, recommended that the Board adopt the proposal.[61] At the meeting, the Board voted to approve the termination, relying solely upon the recommendation of Dr. Clark.[62] McGuiness, accompanied by Summerville, notified plaintiff of the termination the following day, October 15, 2003.[63] McGuiness testified that this was when she first learned of plaintiff's pregnancy, because after reading the termination letter, plaintiff stated: "Well, there is something you need to know.  I am pregnant and I am taking my two-week notice as maternity

---

[58] Doc. no. 18, at Ex. H (Deposition of Linda Walker), p. 50, line 16 - p. 51, line 9.

[59] *Id*. at Ex. I (Joint Stipulation of Facts), ¶ 1.

[60] *Id*. at Defendant's Statement of Undisputed Facts, ¶¶ 62-64.

[61] *Id*. at Ex. I, ¶¶ 2, 4.

[62] *Id*. at Ex. I, ¶¶ 3-6.

[63] *Id*. at Defendant's Statement of Undisputed Facts, ¶ 109.  Valerie Mason, a non-pregnant teacher's aide, was eventually hired to replace plaintiff.  Doc. no. 20, Plaintiff's Statement of Undisputed Facts, ¶ 37.

leave."[64]  McGuiness testified that, prior to hearing this from plaintiff, she "had no

inkling at all" that plaintiff was pregnant, and that it was "absolutely" a surprise to

hear of the news.[65]

Plaintiff, however, is not convinced.  At her deposition, plaintiff gave the

following explanation for her termination:

> Q.    Do you have any knowledge about anything they knew or had
> been told by anyone that suggests that they knew you were
> pregnant as of the date you were given the termination notice,
> until you told them?
>
> A.    At the time it happened, I didn't know if they knew or didn't
> know.  But since — *I can't figure out why they would fire me for
> any other reason*.[66]

Although the decision maker is referred to as "they" in this passage, it should be

evident from the facts recited above that Principal McGuiness, and not the

Superintendent or the members of the City Board of Education, effectively was the

final decision maker on the subject of plaintiff's termination.  *See Stimpson v. City

of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999) (noting that, "in some cases,

a discharge recommendation by a party with no power to actually discharge the

employee may be actionable if the plaintiff proves that the recommendation directly

---

[64] Doc. no. 18, ¶¶ 112, 118-119.

[65] *Id*. at ¶ 119.

[66] *Id*. at Ex. A, p. 139, lines 2-10 (emphasis supplied).

-14-

resulted in the employee's discharge").  The parties have essentially stipulated to the fact that McGuiness was the final decision maker,[67] and plaintiff has conceded she does not believe anyone on the Board knew of her pregnancy.[68]  Thus, the real question in this case is whether McGuiness was actually motivated to terminate plaintiff's employment due to her pregnancy, as plaintiff contends, or by plaintiff's inadequate job performance, as McGuiness contends.  More fundamentally, the issue is whether McGuiness was *even aware* of plaintiff's pregnancy at the time the decision to terminate her employment was made.[69]  Seizing on the lack of evidence in this regard, defendants have moved for summary judgment, asserting plaintiff's inability to establish a causal connection between her pregnancy and the adverse employment action.[70]  Defendants also move that the official capacity claim against Dr. Henry Clark (the Superintendent of Madison City Schools) be dismissed as redundant, since the Board of Education is the only legal entity that could take action to terminate plaintiff's employment.[71]  *See*, *e.g.*, *Portera v. State of Alabama Department of Finance*, 322 F. Supp. 2d 1285, 1287 (M.D. Ala. 2004).

---

[67] *Id*. at Ex. I, ¶¶ 4-6.

[68] *Id*. at Defendant's Statement of Undisputed Facts, ¶ 127.

[69] The Equal Employment Opportunity Commission sided with McGuiness on this point, finding that the evidence suggested the decision to terminate plaintiff was made before McGuiness ever knew of plaintiff's pregnancy.  *See id*. at ¶ 132.

[70] Doc. no. 16.

[71] *Id*.

## PART THREE

### *The Burden-Shifting Framework*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin."  42 U.S.C. § 2000e-2(a)(1) (emphasis supplied).[72] The Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), amended Title VII for the purpose of making clear that "the sex-based discrimination in § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), applies with equal force to discrimination on the basis of 'pregnancy, childbirth, or related medical conditions.'"  *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000) (citing *Byrd v. Lakeshore Hospital*, 30 F.3d 1380, 1382 (11th Cir. 1994)).  *See also Armstrong v. Flowers Hospital, Inc.*, 33 F.3d

---

[72] The full text of this keystone provision of the Civil Rights Act of 1964 reads as follows:

> It shall be an unlawful employment practice for an employer—
> **(1)**  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> **(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

1308, 1312 (11th Cir. 1994) ("Rather than introducing new substantive provisions protecting the rights of pregnant women, the PDA brought discrimination on the basis of pregnancy within the existing statutory framework. . . ."). Therefore, "[t]he analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." *Armindo*, 209 F.3d at 1320. *See also Maddox v. Grandview Care Center, Inc.*, 780 F.2d 987, 989 (11th Cir. 1986).

Plaintiff can establish intentional discrimination on the basis of pregnancy with either direct or circumstantial evidence. *See Armstrong*, 33 F.3d at 1313. In the absence of direct evidence, as here,[73] plaintiff must rely upon circumstantial evidence, and navigate the burden-shifting analytical framework first promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Under that now familiar framework, plaintiff bears the initial burden of establishing a *prima facie* case of intentional discrimination on the basis of her sex (in this case, her pregnancy). *Burdine*, 450 U.S. at 253-54 & n.6; *McDonnell Douglas*, 411 U.S. at 802. If plaintiff succeeds in establishing a *prima facie* case, it gives rise to a presumption of intentional discrimination, which shifts to the employer the burden of producing

---

[73] Doc. no. 20, p. 20 n.1 (admitting plaintiff has no direct evidence).

-17-

legitimate, non-discriminatory reasons for the challenged employment action.  *See*, *e.g.*, *Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at 802; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a *prima facie* case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255.  If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S at 257, the presumption of discrimination created by the *prima facie* showing "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.

At that point, the burden shifts back to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely a pretext for intentional discrimination.  *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804).  *Cf. Reeves v. Sanderson Plumbing Products*, *Inc.*, 530 U.S. 133, 148 (2000) (holding, in the

context of a Rule 50 motion, that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").  If a plaintiff does so, then she "is entitled to survive summary judgment," *Combs*, 106 F.3d at 1529, *except* in the rare situation where, notwithstanding the evidence of pretext, "no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 134-35.  In any case, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves*, 530 U.S. at 143.

## PART FOUR

### *The Elements of Plaintiff's Prima Facie Case*

The central issue presented in this suit is whether plaintiff has sufficient evidence to support each element of her *prima facie* case of intentional discrimination under the Pregnancy Discrimination Act ("PDA").  In *Armstrong v. Flowers Hospital*, 33 F.3d 1308 (11th Cir. 1994), the following generic framework was held to capture the essentials of a PDA claim:  "(1) the plaintiff is a member of a group protected by Title VII; (2) the plaintiff was qualified for the position; (3) the plaintiff suffered an adverse effect on her employment; and (4) the plaintiff suffered from differential application of work or disciplinary rules."  *Id*. at 1315.  Although it is a good starting

point, this somewhat boilerplate language does not clearly address the one interstitial aspect of the PDA cause of action which currently concerns the court.  *Cf. Hargett v. Delta Automotive*, *Inc.*, 765 F. Supp. 1487 (N.D. Ala. 1991) (explaining the need for occasional variation from the *McDonnell-Burdine* paradigm).  Specifically, does a *prima facie* case under the PDA also include a requirement that plaintiff demonstrate a causal connection between her protected status and the adverse employment action of which she complains?  In other words, is it necessary to show that, when the decision to terminate plaintiff was made, the decision-maker actually was *aware* of her pregnancy?  Although the Eleventh Circuit has not directly confronted this question, common sense and relevant authority resoundingly suggest an affirmative answer.[74]

---

[74] For example, the classic elements of a common-law tort claim, based upon a theory of the defendant's negligence, may be stated as follows:

> 1. a duty imposed (or obligation recognized) by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks of injury or damage ("duty");

> 2. a failure on the actor's part to conform to the standard required ("breach of duty");

> 3. a reasonably close causal connection between the conduct complained of and the plaintiff's injury ("proximate cause"); and,

> 4. proof of actual loss or damages sustained by the plaintiff.

*See*, *e.g.*, William L. Prosser, *Law of Torts* § 30, at 143 (4th ed. 1971).  The third and fourth elements often are conflated into one:  *i.e.*, "loss or damage as a proximate result thereof."  Conceptually speaking, the elements of disparate treatment claims under federal civil rights statutes are not greatly

In the parallel area of intentional religious discrimination under Title VII, the

Eleventh Circuit has held that:

> A prima facie case is established if the plaintiff demonstrates the challenged employment decision was made by someone who was *aware of the plaintiff's religion*.   Accordingly, an employer cannot intentionally discriminate against an individual based on his religion *unless the employer knows the individual's religion*.   Therefore, when we evaluate a charge of disparate treatment employment discrimination, we must focus on the *actual knowledge and actions of the decision-maker*.

---

different.  "Duties" are imposed upon "employers" (a term defined by each statute in various ways) by one of the anti-discrimination statutes; the "breach of duty" element is satisfied by proof that an employer *intentionally* discriminated against an employee on the basis of one of the characteristics protected by the federal statute; and, proof of a causal linkage between the first two elements completes the claim, filling the place occupied by the concept of "proximate cause" in the lexicon of common-law tort law.

Thus, Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  That provision defines the "duty" imposed by federal law upon those persons or entities meeting the definition of an "employer."  To establish that an employer violated this statutory duty, an individual plaintiff in a disparate treatment case must satisfy at least three, basic, elements of proof:  (1) that her employer possessed a discriminatory animus toward, and intended to discriminate against, plaintiff because of (or based upon) plaintiff's protected characteristic (*e.g.*, her pregnancy); (2) a serious and material alteration in the terms, conditions, or privileges of plaintiff's employment (*e.g.*, she was fired); and (3) a causal linkage between the two.  *See, e.g.*, *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999); *Llampallas v. Mini-Circuits*, *Lab*, *Inc*., 163 F.3d 1236, 1245-46 (11th Cir. 1998).

These elements of proof, however, should not be confused with the *McDonnell Douglas* analytical framework discussed in Part Three of this opinion.  Rather, the three-step *McDonnell Douglas* test — and particularly the first, "*prima facie* case" step — *essentially* addresses only the first element listed above:  *i.e.*, a plaintiff's circumstantial proof that an employer *intended* to discriminate against her on the basis of a characteristic protected by Congress.

*Lubetsky v. Applied Card Systems*, 296 F.3d 1301, 1305-06 (11th Cir. 2002) (extensive internal citations and explanatory parentheticals omitted) (emphasis supplied), *cert. denied*, 537 U.S. 1106 (2003).  The rationale behind this requirement is obvious.  Title VII was aimed at eradicating *intentional* discrimination; that is, adverse employment actions taken "*because of* such individual's race, color, religion, *sex*, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis supplied).  When Title VII was amended in 1978 by the PDA, the general spirit of the legislation was not altered.  *See Armindo*, 209 F.3d at 1320 (explaining that the analysis under the PDA is identical to that under Title VII generally).  Indeed, the holding in *Lubetsky* is not limited to the religious discrimination realm:  the court's admonition to "focus on the *actual* knowledge and actions of the decision-maker" is applicable *any time* there is "a charge of disparate treatment employment discrimination." *Lubetsky*, 296 F.3d at 1306 (emphasis supplied).

A relatively recent opinion of the Sixth Circuit on this point is instructive, and deserving of lengthy quotation:

> Unlike race and gender, early pregnancy is not an obvious condition.  Rather, a woman in the early stages of pregnancy is more like an employee who suffers from a disability or illness that has no noticeable symptoms.  An employee who is HIV positive, for example, may exhibit no outward manifestation of the illness until it reaches its later stages, and it is entirely possible for an employer to terminate such an employee without having any knowledge of the disability. Similarly,

an employer may well have no knowledge of the early stages of an employee's pregnancy unless the employee has made her circumstances known to the employer or the pregnancy directly affects the employee's ability to perform her job.

This circuit has not expressly addressed the question of whether an employer must have actual knowledge of an employee's pregnancy to be liable for pregnancy discrimination under Title VII. We have held, however, in an unpublished opinion, that an employer's defense of lack of knowledge of the pregnancy in a pregnancy discrimination case failed because the record contained evidence demonstrating that the individual who made the decision to dismiss the employee in fact knew of the pregnancy. . . .

Other circuits have held that a pregnancy discrimination claim cannot succeed in the absence of evidence of the employer's knowledge of the pregnancy. In *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578 (3rd Cir. 1996), the Third Circuit stated that "[i]f the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge and present, as part of her prima facie case, evidence from which a rational jury could infer that the employer knew that she was pregnant." *Id.* at 581. The Seventh Circuit recently held — albeit in a case in which the plaintiff proceeded under the direct evidence method of proof — that a claim of pregnancy discrimination "cannot be based on [a woman's] *being* pregnant if [the employer] did not know she was." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1006 (7th Cir. 2000) (italics in original).

Our review of . . . the law of other circuits addressing the issue leads us to the conclusion that in order to establish the fourth prong of a prima facie case of pregnancy discrimination, that is, that there is a nexus between the employee's pregnancy and the adverse employment action, the employee bears the burden of demonstrating that the employer had actual knowledge of her pregnancy at the time that the adverse employment action was taken.

*Prebilich-Holland v. Gaylord Entertainment Co.*, 297 F.3d 438, 443-44 (6th Cir.

2002) (alterations and emphasis in original).  *Cf. Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) (announcing, in the context of an ADEA case, that "[w]e . . . join our sister circuits in concluding that a defendant's discriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant"); *Garcia v. Women's Hospital of Texas*, 143 F.3d 227, 230-31 (5th Cir. 1998) ("To make out a *prima facie* violation of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978 . . . [a plaintiff must show that the defendant] intentionally treated her differently than non-pregnant employees *because of her pregnancy*. . . .") (emphasis supplied).  To the extent that any questions remain in the wake of *Lubetsky*, this court finds the decisions of the Second, Third, Fifth, Sixth, and Seventh Circuits persuasive, and concludes that a causal connection between the plaintiff's pregnancy and her termination is an essential element of her *prima facie* case under the PDA.

## PART FIVE

### *The Absence of Causation Evidence*

The conclusion that a showing of causation is required under the PDA proves fatal to plaintiff's case.  In support of that element, plaintiff initially cites the testimony of other school workers who acknowledge their awareness of plaintiff's pregnancy.  She then argues on the basis of that evidence that the employees likely

passed this information along to McGuiness.  Add to that the allegation that McGuiness saw plaintiff wearing maternity clothing, and acted to terminate her employment very shortly afterwards, and plaintiff claims to have presented a strong circumstantial showing of causation.[75]  But even failing circumstantial proof, plaintiff contends that it is enough to show *constructive* knowledge — *i.e.*, that McGuiness "should have known" of her pregnancy.

As discussed below, however, plaintiff's evidence of a causal connection consists of nothing more than "merely colorable" insinuations of perjury and general speculation that is in no way "significantly probative" of a causal nexus.  *Raney v. Vision Guard Service*, *Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997) (quoting *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986)).

## A.    Chain of Communication Theory

With respect to what might be termed plaintiff's "chain of communication" argument, the truth is that each of the individuals with knowledge of plaintiff's

---

[75] Notably, plaintiff does not rely upon her alleged entry of "doctor visit - - pregnancy test" into the "comment" section of her time card on October 13, 2003, as circumstantial evidence that McGuiness was aware of her pregnancy.  This is just as well, however, for any argument that this allegation could create an issue of fact as to causation fails for many of the same reasons discussed below in connection with plaintiff's other theories.  Specifically, there is no testimony that McGuiness in fact saw this time card, *cf. Robinson v. Adams*, 847 F.2d 1315, 1317 (9th Cir. 1987), and in any case, all evidence indicates that the decision to terminate plaintiff was made prior to October 13.

pregnancy explicitly denied informing McGuiness of plaintiff's condition.[76] They did so repeatedly, in the face of heavy questioning on the issue.  Without some form of objective evidence to the contrary, to go behind the witnesses's sworn testimony and find a genuine issue of material fact based on the remote possibility that they are lying under oath would be just the type of conjecture that courts have singled out for disapproval.  *See*, *e.g.*, *Cordoba v. Dillard's*, *Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (internal quotations omitted) (emphasis in original); *Clover v. Total System Services*, *Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999) ("The evidence that Miller and Hollingsworth spoke in the time period between Clover's participation in the investigation and Miller's decision to terminate her shows, at the most, that Hollingsworth could conceivably have told Miller about Clover's participation.  But because 'could have told' is not the same as 'did tell,' it would be pure speculation [to draw that inference].");  *Raney*, 120 F.3d at 1198 ("Raney offered nothing more than an assertion based on a hunch that Carter informed Vinson's vice-president of Raney's plan to file charges with the EEOC [and, thus, could not avoid summary judgment].");  *Woodman*, 411 F.3d at 88 ("Because Woodman fails to offer any evidence indicating that Cox or Ahrens ever

---

[76] *See* doc. no. 18, Defendant's Statement of Undisputed Facts, ¶¶ 84, 88-90, 94-95, 98.

communicated what they knew of her age to any Fox decision-maker, Woodman's account of their conversations cannot, by itself, support an inference that the circumstances of her discharge indicate age discrimination.").

A district court case out of Illinois drives the point home.  In *Peppers v. Climco Coils Co.*, Case No. 01-C-50163, 2002 WL 31163753 (N.D. Ill. Sept. 30, 2002), the court considered a PDA claim where knowledge was contested.  As here, the decision maker in *Peppers* admitted learning of the plaintiff's pregnancy *after* he demoted her, but plaintiff asserted that "he must have known about it beforehand because [plaintiff's] immediate supervisor . . and [the decision maker's] immediate subordinate . . . each knew about it and they were . . . in the 'chain of authority.'" *Id*. at *1.  The court summarily rejected this theory after noting that, as here, both of the employees who found out about the plaintiff's pregnancy before the adverse action was taken, testified that they did not disclose it to anyone else.  *Id*.  Thus, the plaintiff had "absolutely no basis to impute their knowledge of her pregnancy [to the ultimate decision maker]." *Id*.

*Peppers* was relied upon by another district court in *Clore v. Correctional Management Co.*, Case No. IP01-1774-C-K/T, 2003 WL 22247199 (S.D. Ind. July 31, 2003).  In *Clore*, the plaintiff brought a claim under the PDA when she was denied a position as Case Manager.  *Id*. at *1.  However, "[t]he uncontradicted

evidence [was] that Ms. Brown [the decision maker] did not know of [plaintiff's] pregnancy when she decided not to give her the Case Manager position." *Id*. at *12. Plaintiff was thus left with arguing that it "'seem[ed] unlikely' that Ms. Brown did not know of her pregnancy . . . because Ms. Brown had consulted with others who knew of her pregnancy." *Id*.   That is, "certain individuals who attended the brainstorming session [concerning the Case Manager opening] were aware of her pregnancy, but the evidence establishe[d] that the only one with a discriminatory animus gave no opinion about whether [plaintiff] should be hired as Case Manager." *Id*.  The court held that "[i]t is not enough for [plaintiff] to speculate that Ms. Brown would have known of her pregnancy where she offers no *evidence* to support a factual finding that Ms. Brown had such knowledge." *Id*. (emphasis supplied).

Plaintiff's arguments in this case are indistinguishable from the positions that were rejected in *Peppers*, *Clore*, and the other cases cited above.  The testimony here, as in *Clore* and *Peppers*, is that the decision to terminate plaintiff's employment was based on McGuiness's own conclusions, reached at a time (the week before Fall Break) when she was unaware of plaintiff's pregnancy.[77]  The employees who knew

---

[77] *See id.* at Ex. B, p. 125, lines 4-10 ("I decided before the [F]all [B]reak that I thought it might be best that we dismiss Mrs. Dohrman. . . .  I know I made the decision prior to [F]all [B]reak [which commenced October 6, 2003]"); *id*. at ¶ 50.

of the pregnancy corroborated McGuiness's testimony that she lacked knowledge.[78]

It appears plaintiff's only response is that, since the testimony does not support what

she subjectively believes, the witnesses must be lying.  Maybe they are, but the

court's duty is to weigh the *evidence*, not to adjudge credibility; and plaintiff has

produced no *evidence* whatsoever to contradict this testimony.  *See*, *e.g.*, *Clover*, 176

F.3d at 1355.

**B.     The Maternity Clothing**

Plaintiff's next theory is that McGuiness could have learned of her pregnancy

through inferences from the maternity attire plaintiff alleges she wore to school on

October 13, 2003, the same day McGuiness recommended plaintiff's termination.

This argument fails for several reasons.

It is worth noting at the outset that McGuiness *and every other employee who*

*was asked* reported *never* having seen plaintiff wear such clothes.[79]  Still, plaintiff

asserts that, on the day in question, McGuiness saw her, "looked at [her] from head

to toe," and "performed a 'double take.'"[80]  The court has not been apprised of exactly

what these maternity clothes looked like, and apparently plaintiff was not visibly

pregnant at the time she was wearing them.  In this regard, plaintiff's claim is similar

---

[78] *Id.* at Defendant's Statement of Undisputed Facts, ¶¶ 84, 88-90, 94-95, 98.

[79] *Id.* at ¶¶ 114-117.

[80] Doc. no. 20, Ex. H, p. 3, unnumbered ¶ 3.

to another theory offered in *Peppers* to establish the decision maker's knowledge of the employee's pregnancy:

> Alternatively, Peppers relies on the fact that one day after she stood up to stretch and complained out loud to herself about back pain, Selmon [the decision maker] said something nearby like, "I guess it wasn't such a good idea."  But to infer from this that Selmon knew about her pregnancy — *i.e.*, that "it" referred to Peppers' getting pregnant — is pure conjecture.  Selmon testified by affidavit he made this comment when he overloaded a paper hole puncher that was located just behind Peppers' desk.  Putting aside Selmon's own explanation, though, Peppers never says she was noticeably pregnant at the time Selmon made this statement, or that she herself referred to her pregnancy when she complained about the back pain, so the "it" in Selmon's "it wasn't such a good idea" comment, even assuming it was directed at Peppers, could have meant anything.  To conclude that Selmon was specifically referring to Peppers' pregnancy is thus a speculative, and not a reasonable, inference.

*Peppers*, 2002 WL 31163753, at *1.  This reasoning applies with equal force to plaintiff's argument here.  While plaintiff believes it is rational to conclude that anyone who saw her would have been alerted to her pregnancy, based simply on the style of her clothing, there is equal (if not greater) support for the conclusion that no one subjectively categorized her clothing as maternity wear.  Indeed, it is the latter conclusion that is supported by the testimony in this case.  And although plaintiff suggests the inference that McGuiness's "double-take" was induced by her realization that plaintiff was pregnant, it might just as plausibly be argued that McGuiness performed a "double-take" because she was cognizant of the fact that she would

momentarily be recommending the termination of the person she was viewing. Without support in the depositions for her arguments, plaintiff has nothing more than "mere curious timing coupled with speculative theories." *Raney v. Vision Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997).

What is more, the timing here is not actually as curious as plaintiff would have the court believe. The unimpeached testimony of McGuiness is that the decision to terminate plaintiff was made, or at least tentatively made, well before October 13, the date of the alleged sighting.[81] Of course, "[a]fter learning of protected activity, an employer's 'proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.'" *Bates v. The Variable Annuity Life Insurance Co.*, 200 F. Supp. 2d 1375, 1383 (N.D. Ga. 2002) (quoting *Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001)). Thus, even if plaintiff's interpretation of the alleged sighting were to be accepted, it would not alter the court's conclusion that causation has not been established.

## C.   Constructive Knowledge

Finally, relying on Eleventh Circuit decisions interpreting the Americans With Disabilities Act, plaintiff attempts to convince the court that her inability to establish

---

[81] *See* doc. no. 18, Ex. B, p. 125, lines 4-10 ("I decided before the [F]all [B]reak that I thought it might be best that we dismiss Mrs. Dohrman. . . .  I know I made the decision prior to [F]all [B]reak [which commenced October 6, 2003]"); *id.* at ¶ 50.

*actual* knowledge is of no moment, because *constructive* knowledge is the appropriate standard.  Although the court can think of numerous justifications for rejecting this argument, perhaps the words of the Eleventh Circuit are the most appropriate rebuttal:  "As a matter of logic, [an employer] could not have fired [an employee] 'because of' a disability that she knew nothing about.  This is why we have said that '[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.'"  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1183 (11th Cir. 2005) (internal citations omitted) (some alterations in original).

The prohibition on the use of a constructive knowledge theory is not limited to ADA claims, either.  In the context of a Title VII case, the Eleventh Circuit clearly held that in evaluating *all* types of disparate treatment employment discrimination claims, "we must focus on the *actual knowledge* and actions of the decision-maker." *Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002) (emphasis supplied).  The Sixth Circuit echoed those sentiments in *Suits v. The Heil Co.*, Case No. 04-6315, 2006 WL 2221006, at * 5 (6th Cir. Aug. 3, 2006), holding that, "[a]t minimum, the employer [in a PDA case] must have had actual knowledge of the pregnancy at the time of the employee's termination."  *Id*.  The court in *Peppers* presumably relied upon this same understanding of Title VII and the PDA when it held that the plaintiff there had "absolutely no basis to impute [the other

employees'] knowledge of her pregnancy [to the ultimate decision maker]." *Peppers*, 2002 WL 31163753 at *1.   Likewise, plaintiff's argument here, that the relevant knowledge should be attributed to McGuiness because she was in the "chain of authority," or because she *should have known* of plaintiff's pregnancy, is unavailing.

## Conclusion

Because plaintiff lacks sufficient evidence to convince a rational factfinder of a causal connection between her pregnancy and the adverse employment action of which she now complains, her case may not advance to the rebuttal and pretext stages, much less to a jury.   *See Prebilich-Holland*, 297 F.3d 438, 444 (11th Cir. 2001).   Thus, defendants' motion for summary judgment is due to be granted.   In light of this disposition, there is no need to consider defendants' additional argument that Dr. Clark should be dismissed as a redundant defendant.   An appropriate order will be entered contemporaneously herewith.

DONE this 26th day of September, 2006.

United States District Judge